IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN JONES | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| GEMALTO, INCORPORATED | : | NO. 11-6902 |

## MEMORANDUM

**Padova, J.**                                                    **March 25, 2013**

Plaintiff, John Jones, has brought this action against his former employer, Gemalto, Incorporated, asserting claims for racial discrimination in employment pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.  Before the Court is Defendant's Motion for Summary Judgment.  For the reasons that follow, the Motion is granted.

## I.      BACKGROUND

A.      Jones's Employment with Gemalto Incorporated

Jones, who is African American, began working for Gemplus Corp. as a machine operator at its Montgomeryville, Pennsylvania facility in October 1996.  (Compl. ¶ 3; Ans. ¶ 3; Patel Decl. ¶ 5.)  On June 1, 2006, Gemplus Corp. merged with Axalto, Inc. and was renamed Gemalto, Incorporated (the two companies are henceforth referred to jointly as "Gemalto"). (Patel Decl. ¶ 5.)  Gemalto's Montgomeryville Facility produces smart cards, Subscriber Identity Modules, e-passports, and PVC cards, such as credit cards.  (Wright Decl. ¶ 3.)  From 1999 until his termination, Jones was a Feeder Operator ("Feeder") in the Printing Department of Gemalto's Cardbodies Group, which produces credit cards.  (Patel Decl. ¶ 8; Wright Decl. ¶¶ 5-6.)  Feeders work as assistants to the lithograph Press Operators (also referred to as "pressmen").  (Wright Decl. ¶ 11.)  Jones's responsibilities as a Feeder were to read the job jacket, help the Press Operator prepare jobs, load the feeder with PVC stock, supply the printer with ink, mount and

put ink into the printing plates, and help the Press Operator keep the printer running.  (Jones Dep. at 18-19, 50; Patel Decl. ¶ 8.)   Jones worked on a four-color Heidelberg printing press that printed 72 credit cards per sheet of PVC, using up to four colors at a time.  (Jones Dep. at 24-26; Patel Decl. ¶ 8.)

The Printing Department is managed by Ed Vega.  (Wright Decl. ¶ 8.)  Employees in the Printing Department are directly supervised by Process Team Coaches who are assigned to each shift.  (Id. ¶ 9.)  Jones worked on the first shift, which was supervised by Andrew Lopez.  (Id. ¶ 9; Jones Dep. at 45-46.)

Jones held a poor opinion of Vega and believed that he mistreated the majority of the Printing Department's employees.  (Jones Dep. at 82-88.)  According to Jones, Vega yelled at and cursed the majority of the employees in the Printing Department and blamed them for things that they did not do.  (Id. at 82-83, 85-87.)  Vega had many altercations with employees over the years, and often threatened to fire his employees.  (Id. at 102-03.)  Over the years, Vega threatened to fire all of the employees in the Printing Department.  (Id. at 104.)  Vega also threatened several employees with physical violence.  (Id. at 105.)  During one meeting, a year or two before Jones was fired, Jones witnessed Vega throw a calculator that hit a Printing Department employee.  (Id. at 106-07.)

B.      Gemalto's Training Procedures for the Printing Department

Prior to September 30, 2010, Printing Department employees did not receive any formal training, only undocumented "on the job" training.  (Patel Decl. ¶ 9.)  Jones had sought training to become a Press Operator before the Printing Department instituted its formal training program.  In 2001, Jones's then supervisor, Joe Kaszan, instructed two pressman, Ron Glassberg and Joe Depalma, to train Jones.  (Jones Dep. at 122-23.)  Glassberg and Depalma both refused

to train Jones to run the printing presses.  (Jones Dep. at 116-20.)  Jones did not complain to anyone about not being trained at that time.  (Id. at 123-24.)  Another supervisor, Joe Speiser, recommended that Jones be trained to operate the Heidelberg press.  (Patel Dep. at 103-07.)  He did not receive this training.  (Id. at 104-05.)  Later, in the 2006-07 time period, Vega wanted Jones to be trained as a backup pressman and told Glassberg to train Jones, but Glassberg still refused to train him.  (Jones Dep. at 125-26, 128.)  Jones believes that he missed out on opportunities to be promoted because he did not get this training.  (Id. at 131.)

On September 30, 2010, Joseph Wright, Operations Manager for the Cardbodies production unit in Gemalto's Montgomeryville Facility, and Joe Kamin, another Operations Manager for Gemalto, held a meeting attended by all Printing Department employees, during which they introduced a formalized training system for printers called the Career Path Training System for Printers.  (Wright Decl. ¶¶ 2, 12.)  During the meeting, Jones indicated that he liked the Career Path concept and complained that he had not received the training he desired in the past.  (Id. ¶ 13.)

C.      Jones's Complaints of Racial Discrimination

On September 30, 2010, after the Career Paths meeting, Jones complained to Wright about racial discrimination at Gemalto.  (Jones Dep. at 143, 145.)  Jones told Wright that his manager had instructed Press Operators to train him, and that he believed that he had not received this training because of his race.  (Id. at 143-44)  Wright told Jones that everyone in the group was supposed to be given a chance to be trained.  (Id. at 146.)

On October 5, 2010, Jones spoke with Michele Giordano, the Director of Human Resources for Gemalto's Montgomeryville Facility, regarding the comments he made during the September 30, 2010 Career Path meeting about his inability to obtain training.  (Id. at 155-56.)

3

Jones told Giordano that he believed that he and other African American employees were being discriminated against and that he was considering speaking with an attorney.[1]  (Id. at 156.)  Jones also told Giordano about discriminatory actions he witnessed being taken against other African American employees.  (Id. at 156-57.)  Giordano told Jones that she would not tolerate any discrimination.  (Id. at 163.)  After his meeting with Giordano, Jones discussed his belief that he was being discriminated against with respect to training in separate conversations with Lopez and Vega.  (Id. at 160-61.)  Both Lopez and Vega dismissed Jones's concerns.  (Id.)

    D.    Jones's Termination

    On May 2, 2011, Gemalto sent Jones a letter notifying him that his employment with Gemalto had been terminated as of Thursday, April 28, 2011.  (Patel Decl. ¶¶ 27-28, Gemalto Ex. 7.)  Jones was fired after he:  (1) engaged in a physically violent altercation with Vega on April 28, 2011; (2) left Gemalto's premises without reporting the incident to anyone associated with Gemalto or notifying anyone that he was leaving; and (3) failed to return to Gemalto on Friday, April 29, 2011 and on Monday, May 2, 2011, and failed to notify anyone at Gemalto that he would be absent on those days.  (Patel Decl. ¶ 18.)

        1.    The altercation

    The altercation began when Jones encountered Vega on his return from the bathroom on the morning of April 28, 2011.  (Jones Dep. at 179-80.)  According to Jones, once Vega saw him, he (Vega) began to yell and curse at him and accused him of walking around too much.  (Id. at 185.)  Jones followed Vega into his office and, at Vega's request, shut the door.  (Id. at 188-89; Vega Decl. ¶ 8.)  After Jones shut the door, Vega, who was still yelling at Jones, shoved him

---

[1]Gemalto disputes Jones's assertion that he complained about racial discrimination in connection with the Career Paths meeting and denies that he ever complained to Giordano about racial discrimination.  (Wright Decl. ¶ 14; Giordano Decl. ¶ 9.)

with both hands, and then punched him on the head.  (Id. at 192, 194, 198, 200-01.)  Jones responded by punching Vega on the head three or four times.  (Id. at 202.)  Vega kicked Jones's right knee and punched his arms.  (Id. at 203-04.)  Afterwards, Jones's right knee swelled up and he had bruises on his arms.  (Id. at 204-05.)

The altercation between Jones and Vega lasted between 20 and 30 seconds, after which Vega fell back and Jones left the room.  (Id. at 205-07.)  Immediately after the altercation, a little after 11:00 a.m., Jones then left Gemalto's premises.  (Id. at 208, 214.)  On his way out, he passed two other employees, Bob Landue, and Mike Farrell.  (Id. at 209.)  He did not speak with anyone in Gemalto's Human Resources Department before he left and did not call anyone employed by Gemalto after he left the facility to discuss what had happened.  (Id. at 214-15, 219, 237.)

After Jones left Gemalto, he drove to the office of his friend Louis Lombardi, a lawyer.  (Id. at 219.)  Lombardi called a defense lawyer, John McMahon, to represent Jones.  (Id. at 222-23.)  McMahon called the police and found out that charges had been filed against Jones.  (Id. at 223.)  The police agreed to let Jones turn himself in the next day, and Jones left Lombardi's office around 6:00 p.m. and went to Abington Hospital.  (Id. at 223-24, 281.)  He was diagnosed with bilateral lower arm swelling and difficulty walking.  (Id. at 282.)  He also sprained his wrist during the fight with Vega and his finger became swollen.  (Id. at 284.)  Jones was discharged from the hospital and told to take over-the-counter ibuprofen.  (Id. at 285.)

> 2.    Gemalto's investigations of the altercation

Three senior Gemalto employees investigated the altercation:   Giordano, Robert Addlesberger, Regional Security and HSE Manager for Gemalto's Montgomeryville Facility; and Prakash Patel, Senior Human Resource Generalist for Gemalto's Montgomeryville Facility.

(Giordano Decl. ¶¶ 1-13; Addlesberger Decl. ¶¶ 2, 5; Patel Decl. ¶¶ 16-18.)  Vega told Giordano, Addlesberger, and Patel that he had been physically attacked by Jones and that he had not provoked Jones's attack.  (Giordano Decl. ¶ 11; Addlesberger Decl. ¶ 5; Patel Decl. ¶ 16.)  Vega also told them that Jones hit him numerous times, including several punches to the face.  (Giordano Decl. ¶ 11; Addlesberger Decl. ¶ 5; Patel Decl. ¶ 16.)  All three senior employees saw Vega soon after the altercation; they saw that Vega's mouth was bloody and that he had lost several teeth.  (Giordano Decl. ¶ 12; Addlesberger Decl. ¶ 5; Patel Decl. ¶ 16.) (Id.)  As a result of the altercation, Vega lost three teeth, several of his other teeth were loosened, and his face and ribs were bruised.  (Gemalto Ex. 20 at Gemalto415; Vega Decl. ¶ 10.)  Addlesberger took Vega to the emergency room at Lansdale Hospital.  (Addlesberger Decl. ¶ 6.)  While Addlesberger and Vega were at the hospital, Addlesberger spoke with Montgomery Township Police officers who were investigating an assault charge against Jones arising from his altercation with Vega.  (Id.) Jones was subsequently charged with aggravated assault, disorderly conduct, reckless endangerment, and simple assault.  (Gemalto Ex. 20 at Gemalto413.)

Addlesberger subsequently assigned Farrell and Robert Green of Gemalto's Security Department to further investigate the altercation between Jones and Vega.  (Addlesberger Decl. ¶ 7.)  Farrell and Green discussed the altercation with several Gemalto employees who saw Jones leave Vega's office and also observed Vega's appearance, and the appearance of Vega's office, after Jones left.  (Id.)  Farrell and Green learned that "Vega suffered numerous injuries, including a severely bruised face, a bloody mouth and face and that Mr. Vega was missing three (3) front teeth.  Mr. Vega's office had blood on the floor and his furniture was disheveled."  (Id.)  Farrell and Green completed their report on May 2, 2011, and concluded that:  "Jones pushed Mr. Vega's desk into him pinning him and then punched Mr. Vega numerous times mostly about the

head and face.  This entire incident began about 10:58 a.m. and ended about 11:00 a.m. with John Jones leaving the plant, getting into his vehicle and driving south on Rout 309."  (Gemalto Ex. 17.)

3.      Violations of Gemalto's policies

Gemalto has taken the position that Jones's actions with respect to his altercation with Vega and his subsequent departure from, and failure to return to, Gemalto's Montgomeryville facility, violated several of Gemalto's policies.  Jones was an at-will employee of Gemalto. (Patel Decl. ¶ 6.)   He was given a copy of Gemalto's Employee Handbook and the Montgomeryville Addendum to the Employee Handbook, both of which contain Gemalto's policies relating to attendance, misconduct, and workplace violence and harassment.  (Id. ¶ 7, Gemalto Exs. 1, 2, 4, 5; Jones Dep. at 246-48, 257-58.)

The Employee Handbook states that employees must "notify their Manager, Department Head, or Human Resources as soon as they know they will be absent from work" and "keep their manager informed about their expected return date."  (Gemalto Ex. 1 at 7; Jones Dep. at 251.) The Employee Handbook also states that "[p]ersonal leave must be requested and granted in advance and must be approved in writing by the immediate Manager and Human Resources." (Gemalto Ex. 1 at 11; Jones Dep. at 252.)   Jones admits that he did not notify his Manager, Department Head or Human Resources that he would not be at work on Friday, April 29 or Monday, May 1, 2011.   (Jones Dep. at 251.)   The Employee Handbook further states that "[r]egular and punctual attendance is a condition of employment.   Failure to observe these guidelines . . . may result in disciplinary action up to and including termination." (Gemalto Ex. 1 at 8.)

Gemalto's Code of Conduct is set out in the Employee Handbook.  (Gemalto Ex. 1 at 18-22; Jones Dep. at 253-54.)   The Code of Conduct states that conduct of an employee that adversely affects Gemalto, its other employees, or customers, may result in dismissal.  (Gemalto Ex. 1 at 18; Jones Dep. at 254.)  The Code of Conduct also states that "[c]ommitting any act of violence or harassment . . . against another employee in the workplace" may subject an employee to discipline, "up to and including termination."  (Gemalto Ex. 1 at 18; Jones Dep. at 255-56.) The Code of Conduct also states that leaving the workplace without authorization is grounds for termination.  (Gemalto Ex. 1 at 18-19; Jones Dep. at 256.)  Jones admits that he did not notify anyone employed by Gemalto that he was leaving on Thursday, April 28, 2011 and that he did not have authorization to leave Gemalto on that date.   (Jones Dep. at 252, 256-57.)   The Montgomeryville Addendum to the Employee Handbook states that an employee is "required to personally contact the on-duty supervisor . . . to report all absences."  (Gemalto Ex. 2 at 5; Jones Dep. at 256, 260.)  Jones did not report his absence to the on-duty supervisor on April 28, 29, or May 2, 2011.  (Jones Dep. at 256-57, 260; Patel Decl. ¶ 18.)

> 4.      The decision to fire Jones

Based upon the information about the altercation that Gemalto obtained from Vega and the other witnesses, Prakash Patel determined that Jones had violated the following Gemalto policies, which are contained in Gemalto's Employee Handbook and the Montgomeryville Addendum:  (1) the Attendance Policy contained in the Employee Handbook; (2) the Code of Conduct regarding acts of violence against other employees in the workplace; (3) the Code of Conduct regarding leaving the job without authorization; (4) the Workplace Violence Policy

contained in Code of Conduct;[2] and (5) the Attendance Policy contained in the Montgomeryville

Addendum.  (Patel Decl. ¶¶ 2, 21; Gemalto Ex. 1 at 7, 18-19; Gemalto Ex. 2 at 5.)  Prakash Patel

consequently recommended to Giordano that Jones be fired for walking off the job without

permission and for workplace violence.   (Patel Decl. ¶ 27.)   Giordano reached the same

conclusions as Prakash Patel.  (Giordano Decl. ¶¶ 11-17.)  She discussed her conclusions with

Roy Patel, Gemalto's Vice-President of Human Resources for North America who is located in

Austin, Texas, and they jointly decided that Jones should be fired for walking off the job without

permission and for workplace violence.  (Id. ¶¶ 22, 26; Giordano Dep. at 58-61.)

5.     Jones's claims for relief

The Complaint asserts two claims for relief.   Count I asserts a claim of racial

discrimination in violation of Title VII based upon Jones's inability to obtain training as a Press

Operator, which prevented him from obtaining a promotion to a Press Operator position.

(Compl. ¶¶ 30-31.)   Count I alleges that Jones and other African-American employees had

requested and had been denied training and promotional opportunities that Gemalto afforded to

Caucasian employees.  (Id. ¶¶ 31, 33.)  Count II asserts a claim for retaliatory discharge in

violation of Title VII based upon Jones's termination.  (Id. ¶ 44.)  Count II alleges that Jones was

subjected to "exacting scrutiny and unfair criticism" after he complained to his Manager and to

Human Resources about discriminatory treatment; that his supervisor assaulted him after he

complained about this treatment; that he was fired after he left Gemalto to obtain medical

---

[2]The Code of Conduct states that committing an act of violence against another employee
in the workplace constitutes misconduct.  (Gemalto Ex. 1 at 18.)  The Code of Conduct also
contains the following language regarding Workplace Violence and Harassment:   "[n]o form of
workplace violence or harassment will be tolerated at work, or outside work, if it has a bearing
on the working relationship. . . .  Gemalto will not tolerate, ignore, or condone any form of
violence or harassment and is committed to promoting appropriate standards of conduct at all
times."  (Id. at 19.)  The Code of Conduct also refers employees to Gemalto's "Anti-Workplace
Violence and Harassment Policy."  (Id.)

attention after his supervisor assaulted him, and that he was fired because he complained about discriminatory practices at Gemalto's Montgomeryville facility.  (Id. ¶¶ 39-41, 43.)

## II.    LEGAL STANDARD

Defendants have moved for summary judgment as to both of Plaintiff's claims. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law."  Id.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the nonmoving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court" that "there is an absence of evidence to support the nonmoving party's case."  Id. at 325.  After the moving party has met its initial burden, the adverse party's response "must support the assertion [that a fact is genuinely disputed] by:  (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials [that the moving party has] cited do not establish the absence . . . of a genuine dispute . . . ."  Fed. R. Civ. P. 56(c)(1).  Summary judgment is appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

## III.    DISCUSSION

A.    Count I:  Racial Discrimination

Count I of the Complaint alleges that Gemalto failed and refused to provide Jones with training to become a Press Operator, and consequently denied him the opportunity to be promoted to a Press Operator position, on the basis of his race, in violation of Title VII.  Title VII  makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

Jones maintains that his discrimination claim should be analyzed pursuant to the burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  (Pl.'s Resp. at 6.)  "Under McDonnell Douglas, the plaintiff bears the initial burden of demonstrating a prima facie case of unlawful discrimination or retaliation."  Dellapenna v. Tredyffrin/Easttown Sch. Dist., 449 F. App'x 209, 213 (3d Cir. 2011) (citing McDonnell Douglas, 411 U.S. at 802). In order to establish a prima facie case of discrimination, Jones must establish:

> (1) [he] belongs to a protected class; (2) [he] was qualified for [his] employment position; (3) despite [his] qualifications, [he] was subjected to an adverse employment action; and (4) the adverse action occurred under circumstances that raise an inference of discriminatory action, such as the employer treating similarly situated persons not belonging to the plaintiff's protected class more favorably.

 Verma v. Univ. of Pa., Civ. A. No. 11-611, 2012 WL 1835727, at *8 (E.D. Pa. May 18, 2012) (citing Sarullo v. United States Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003)).

If Jones succeeds in establishing a prima facie case of discrimination, "the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its decision."  Dellapena, 449 F. App'x at 213 (citing McDonnell Douglas, 411 U.S. at 802).  If the

employer is able to meet its "'relatively light burden,'" "the burden of production returns to the plaintiff, who can defeat summary judgment only by showing by a preponderance of the evidence that the employer's stated reason is pretextual." Id. (quoting and citing Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)). Consequently, if Gemalto is able to state a legitimate and nondiscriminatory reason for failing to train Jones as a Press Operator, Jones "must produce evidence that either '(1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of'" the failure to train. Id. (quoting Fuentes, 32 F.3d at 762). Jones cannot meet his burden at this last step simply by showing that Gemalto was wrong, rather, he "must uncover 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in [Gemalto's] explanations that would permit a reasonable factfinder to believe that [Gemalto] did not actually act for its stated reasons." Id. (quoting Fuentes, 32 F.3d at 765).

Gemalto argues that it is entitled to summary judgment with respect to Count I of the Complaint because Jones cannot establish a prima facie case of discrimination since: (1) he was not qualified for his position, (2) failure to train is not an adverse employment action, and (3) there isn't any evidence that he was denied training based on his race. Gemalto also argues that it is entitled to summary judgment with respect to Count I because it had a legitimate, non-discriminatory reason for failing to provide Jones with the training he wanted.

        1.      Jones's qualifications for his job

Gemalto contends that Jones cannot establish a prima facie case of discrimination because he was not qualified for his job. Gemalto argues that, since Jones violently assaulted his boss and walked off the job, he violated several of Gemalto's policies and was thus not qualified

to be employed by Gemalto.  Defendant relies on <u>Nelson v. DeVry, Inc.</u>, Civ. A. No. 07-4436, 2009 WL 1213640 (E.D. Pa. Apr. 23, 2009).  The plaintiffs in <u>Nelson</u> were terminated after their employer learned that they had both failed to disclose, at the time of hiring, that they had criminal convictions.  <u>Id.</u> at *3.  The plaintiffs sued, claiming that they had been terminated on the basis of their race (African American) in violation of Title VII.  <u>Id.</u> at *3-*4.  The <u>Nelson</u> court determined that the plaintiffs had each failed to establish a prima facie case of discrimination pursuant to <u>McDonnell Douglas</u> because, since they both had criminal backgrounds at the time they were hired, they were both disqualified from employment with their employer.  <u>Id.</u> at *6.  The <u>Nelson</u> court also noted that the plaintiffs' failure to disclose their criminal backgrounds violated company policy and subjected them to a "provision that they could be terminated at any time for dishonesty.  An employee who violates a company policy which results in that employee's discharge is not meeting the employer's legitimate expectations."  <u>Id.</u> (citing <u>Hairston v. Runyon</u>, Civ. A. No. 96-8707, 1997 WL 798240, at *2, *4 (E.D. Pa. Dec. 11, 1997)).

This case is, however, different from <u>Nelson</u>.  The <u>Nelson</u> plaintiffs were convicted of crimes before they were hired by their employer and they would not have been hired had they complied with their employer's policy requiring disclosure of their prior criminal convictions. <u>Id.</u> at *6.  In this case, however, Gemalto contends that Jones violated its policies immediately prior to his termination, it does not dispute that he was qualified for his position at the time he was hired or at any other time prior to April 28, 2011.  Gemalto's argument that Jones's violation of its policies from April 28 through May 2, 2011 prevents him from establishing a prima facie case of discrimination is thus unconvincing.  It is "inappropriate to confuse an analysis of whether Plaintiff's alleged (and contested) violations of company policy constitute impermissible

pretext for discrimination with whether Plaintiff has demonstrated prima facie that [he] was qualified for [his] position." Spigarelli v. Target Corp., Civ. A. No. 09-1938, 2012 WL 5287889, at *2 (E.D. Pa. Oct. 25, 2012). "In other words, Defendant may not justify summary judgment in its favor by saying Plaintiff wasn't qualified [for his position] because [he] violated [Defendant's] policy, when it also says that [he] was terminated for said violations and Plaintiff disputes those same alleged violations." Id.

There is evidence in the record that Jones had experience as a Feeder prior to joining Gemalto. (Jones Dep. at 56.) There is no evidence in the record that Jones was unable to successfully perform the tasks involved in his position as Feeder. Indeed, Jones received numerous pay raises during his employment with Gemalto. (Patel Decl. ¶ 31; Gemalto Exs. 8-10.) Under these circumstances, we find that the record contains evidence establishing the second element of a prima facie case of race discrimination, that Jones was qualified for his job.

2.      Adverse employment action

Gemalto contends that Jones cannot establish a prima facie case of discrimination because denial of training is not an adverse employment action, and because there is no evidence that Jones was denied training because of his race. Gemalto maintains that the United States Court of Appeals for the Third Circuit has determined that denial of training is not an adverse employment action. Gemalto relies on Pagan v. Gonzalez, 430 F. App'x 170 (3d Cir. 2011), in which the Third Circuit agreed with a district court's determination that denial of training was not an adverse employment action in that case because there was no evidence that the denial of training cause the employee's work to suffer or that the employee's "advancement or earning potential was affected." Id. at 172. However, the instant Complaint alleges that, as a result of Gemalto's refusal to train Plaintiff as a Press Operator, he has been deprived of the opportunity

14

to be promoted to a Press Operator position.  (Compl. ¶¶ 31-32.)  "'Title VII specifically designates discrimination in training, including on-the-job-training programs as an unlawful employment practice.'"  Lucas v. City of Philadelphia, Civ. A. No. 11-4376, 2012 WL 464929, at *5 (E.D. Pa. Feb. 13, 2012) (quoting Albright v. City of Philadelphia, 399 F. Supp. 2d 575, 587–88 (E.D.Pa. 2005)).  "This is particularly true where the lack of training substantially decreases an employee's earning potential." Id. (citing Broidy v. Am. Gen. Fin. Co., Civ. A. No. 98–2728, 1999 WL 387269, at *2 (E.D. Pa. May 28, 1999); and Pajic v. Cigna Corp., Civ. A. No. 89–2404, 1990 WL 191939, at *9 (E.D. Pa. Nov. 30, 1990)).  See also Burgess-Walls v. Brown, Civ. A. No. 11-275, 2011 WL 3702458, at *5 (E.D. Pa. Aug. 22, 2011) ("Denial of training is sufficiently severe as to alter the terms of a plaintiff's employment or deprive a plaintiff of employment opportunities where training is necessary for career advancement." (citing Albright, 399 F. Supp. 2d at 588)).  We conclude that denial of training that prevents an employee from obtaining a promotion, as alleged in the instant Complaint, satisfies the third element of a prima facie case of race discrimination, that Jones suffered an adverse employment action.

Gemalto also argues that Jones cannot establish a prima facie case of discrimination based on denial of training because there is no evidence that he was denied training based on his race.  The Complaint alleges that Jones was denied training as a Press Operator.  (Compl. ¶ 32.) Jones claims that his former supervisor, Kazsan, recommended him for training as a Press Operator a decade before he was fired and that he never received this training.  (Jones Dep. at 122-24.)  There is also evidence that another former supervisor, Joe Speiser, recommended that Jones be trained to operate the Heidelberg press and make plates.  (Patel Dep. at 103-04.)  There are no notations in Jones's personnel file to show that he received this training.  (Id. at 109-10.)

In the 2006-07 time period, Vega also recommended that Jones be trained to operate a press. (Jones Dep. at 125-26.)  Prior to 2010, Jones received some training regarding how to run black copy on the press, but not enough training to be able to do it consistently.  (Vega Dep. at 54-58.)[3]

Jones contends that he has satisfied the fourth element of a prima facie case of discrimination because there is evidence that other Gemalto employees, who are not African American, have been trained as Press Operators.  Jones relies exclusively on Vega's deposition testimony to support this contention.  Vega testified regarding four individuals who have been trained as pressmen by Gemalto.  One individual, Mike Depalma, originally operated the two-color press and is currently being trained to operate a different press because Gemalto removed its two-color press in March 2012.  (Vega Dep. at 19.)  Kody Rityavong is presently being trained as a Press Operator, his training began approximately two and one-half years ago, after he applied for an open Press Operator job.  (Vega Dep. at 34-35.)  Kevin Miller completed some training as a Screen Press Operator after applying for an open Screen Press Operator position on the second shift.  (Id. at 39.)  He later returned to his previous job as a screen maker.  (Id. at 39-40.)  Terry Donovan was a racker on the second shift for two years before he started working as a Press Operator.  (Id. at 41-42.)  He did not apply for a posted Press Operator position, rather, he

---

[3]It appears that Title VII's statute of limitations ran with respect to each of these instances of denial of training prior to the date on which Jones filed his administrative claim in this case on May 20, 2011.  (Patel Decl. ¶ 40; Gemalto Ex. 15.)  The running of the limitations period does not deprive us of jurisdiction, however, and Gemalto has not asserted the time bar as a defense with respect to this claim.  We conclude, accordingly, that Gemalto has waived the statute of limitations defense as to Jones's denial of training claim.  See Mandel v. M & Q Packaging Corp., 706 F.3d 157, 165 (3d Cir. 2013) ("To bring suit under Title VII, a claimant in a deferral state, such as Pennsylvania, must first file a complaint with the EEOC within 300 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e–5(e)(1).  '[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.'" (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002))); National R.R. Passenger Corp. v. Morgan, 536 U.S. at 121 (noting that "the filing period is not a jurisdictional prerequisite to filing a Title VII suit. Rather, it is a requirement subject to waiver, estoppel, and equitable tolling").

16

was selected to become a pressman.  (Id. at 42.)  In sum, the evidence upon which Jones relies shows that one Gemalto employee who was already employed as a Press Operator was trained to operate a different press, two individuals who applied for open positions as Press Operators were hired for those positions and received training for those positions after they were hired, and one individual was trained as a Press Operator after being selected for that position.

Jones never applied for a position as a Press Operator with Gemalto.  (Jones Dep. at 261; Patel Decl. ¶ 37.)  Consequently, he is not similarly situated to Rityavong or Miller, both of whom applied for positions as Press Operators before being trained.  He is also not similarly situated to Depalma, who was employed as a Press Operator on the two color press before it was removed, and was then trained on a different press.  We are, however, aware of no fact that distinguishes Jones from Donovan, except that Donovan is Caucasian.  (Jones Dep. at 98.)  Thus, there is evidence in the record that an employee of Gemalto who was similarly situated to Jones, but who is not a member of Jones's protected class, was treated more favorably than Jones in that he received training that Jones did not receive.  Since there is also evidence in the record regarding the other elements of a prima facie case of discrimination, i.e.,  that Jones belongs to a protected class, that Jones was qualified for his job, and that Jones suffered an adverse employment action, we conclude that Jones has established a prima facie case of discrimination in connection with his claim that he was denied training based on his race in violation of Title VII.  See Verma, 2012 WL 1835727, at *8.

### 3.     Gemalto's stated reason for failing to train Jones

Gemalto maintains that it had a legitimate, nondiscriminatory reason for not providing the training that Jones wanted.  Gemalto contends that Jones did not receive all of the training he needed to become a Press Operator because there was not enough time for him to complete that

training during his shift.  There is evidence that, between 2005 and 2010, Jones was trained to run black copy on the six-color press, the first step to becoming a Press Operator, but because of Gemalto's workflow, he did not obtain enough training to be able to run black copy consistently. (Vega Dep. at 51-52, 54-59, 72-74.)  Jones trained with Ron Gleissberg between ten and fifteen times, learning how to print black copy, and also trained three to five times each with Mike Depalma and Kerry Koenig.  (Id. at 80-82.)  Vega testified during his deposition that Jones was unable to complete his training to become a Press Operator because, due to workflow during Jones's shift, there was not sufficient time to train Jones on the operation of the press.  (Id. at 58-59, 72-77.)  According to Vega, in order to free up a press for training, he would have to bump the pressman from the machine, and that he could not do that because Gemalto's workflow required him to have the machines running continually over three shifts.  (Id. at 74-77.)  Vega further explained that "[w]e do over 2,000 jobs a year with over 6 or 7 or 8 colors per particular order.  So those machines are basically almost never down . . . ."  (Id. at 77.)  Based upon this evidence, we conclude that Gemalto has satisfied its burden of production of articulating a legitimate, nondiscriminatory reason why it failed to completely train Jones as a Press Operator. See Dellapena, 449 F. App'x at 213 (citing McDonnell Douglas, 411 U.S. at 802).

"At the third step, 'the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the [defendant's] explanation is pretextual." Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 271 (3d Cir. 2010) (alteration in original) (quoting Fuentes, 32 F.3d at 763).  Jones may meet his burden of production by "*either* (i) discrediting the proffered reasons, either circumstantially or directly, *or* (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a . . . determinative cause of the adverse . . . action.'"  Id. at 277 (quoting Fuentes, 32 F.3d at 764) (alterations in

original).   "'[T]hroughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff.'"   Id. at 271 (quoting Fuentes, 32 F.3d at 763).

Jones has made no attempt to satisfy his burden at the third step.  (See Pl.'s Resp. at 7.) Rather, he has rested on his prima facie case.  (See id.)  Since Jones has made no attempt to satisfy his burden of showing by a preponderance of the evidence that Gemalto's stated reason for not fully training him to become a pressman is pretextual, we conclude that Jones has not responded to the Motion for Summary Judgment with a factual showing sufficient to establish that Gemalto intentionally discriminated against him by denying him training as a Press Operator.  Celotex, 477 U.S. at 322; see also Anderson, 621 F.3d at 271.  Gelmalto's Motion for Summary Judgment is, therefore, granted as to Count I of the Complaint.[4]

---

[4]Gemalto also argues that it is entitled to summary judgment as to Count I of the Complaint because Jones has not established a prima facie case of discrimination with respect to his claim that Gemalto discriminated against him by failing to promote him to a Press Operator position because of his race.  We do not understand the Complaint to assert a separate failure to promote claim.  Rather, the Complaint alleges that Gemalto's failure to train Jones as a Press Operator prevented him from being promoted to such position.  (Compl. ¶¶ 30-32.)  However, to the extent that the Complaint does allege that Gemalto discriminated against Jones by denying him promotion to a Press Operator position on the basis of his race, we conclude that Gemalto is correct.  In order to establish a prima facie claim for failure to promote in violation of Title VII, a plaintiff must show the following:

> (1) [he] belongs to a protected class; (2) [he] applied to and was qualified for an available position; (3) despite [his] qualifications, [he] was rejected; and (4) after [he] was rejected the position remained open and the [defendant] continued to seek applications from persons with [his] qualifications.

Peace-Wickham v. Walls, 409 F. App'x 512, 524 (3d Cir. 2010) (citing McDonnell Douglas, 411 U.S. at 802).  Jones has admitted that he never applied for an open Press Operator position with Gemalto.  (Jones Dep. at 261; Patel Decl. ¶ 37.)  Consequently, Jones cannot establish a prima facie claim of racial discrimination in connection with Gemalto's failure to promote him to a Press Operator position.

B.      Count II:  Retaliatory Discharge

Count II of the Complaint alleges that Gemalto fired Jones in retaliation for his making complaints about discriminatory practices in the workplace in violation of Title VII.  "In the absence of direct evidence of retaliation, retaliation claims . . . typically proceed under the McDonnell Douglas framework."  Fasold v. Justice, 409 F.3d 178, 188 (3d Cir. 2005) (citations and footnotes omitted). To establish a prima facie case of retaliation, a plaintiff must establish: "(1) he engaged in protected activity, (2) his employer took an adverse employment action against him, and (3) there was a causal connection between his participation in the protected activity and the adverse employment action."  Estate of Oliva ex rel. McHugh v. New Jersey, 604 F.3d 788, 798 (3d Cir. 2010) (footnote omitted) (citing Moore v. City of Philadelphia, 461 F.3d 331, 340–41 (3d Cir. 2006)).  "As with discrimination claims, if a plaintiff establishes a prima facie case, the employer must show a legitimate, non-discriminatory reason for the adverse action.  The burden then shifts back to the plaintiff to demonstrate that the offered reason is pretextual."  Warfield v. SEPTA, 460 F. App'x 127, 131 (3d Cir. 2012) (citing Moore, 461 F.3d at 342). "Protected conduct includes the filing of formal charges of discrimination and informal protests of discriminatory activities, such as making complaints to management." Id. (citing Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995)).  Protected activity does not encompass "very generalized complaints about unfair treatment. At a minimum, the conduct must convey a protest of discriminatory practices such that it will be understood that a complaint about an unlawful employment practice has been advanced." Id. (citing Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006)).

Gemalto argues that it is entitled to summary judgment as to Count II of the Complaint because:  (1) there is no evidence that Jones was fired because he complained about

discrimination; (2) Gemalto had legitimate, non-discriminatory reasons for firing him; and (3) there is no evidence that Gemalto's legitimate, non-discriminatory reasons for firing Jones were pretextual.

### 1.    Prima facie case of retaliation

Gemalto argues that Jones cannot establish a prima facie case of retaliation in violation of Title VII because there is no evidence that demonstrates a causal link between Jones's protected activity and his termination.  Jones testified at his deposition that he engaged in protected activity on September 30, 2010, when he complained to Operations Manager Wright that he had been denied training because of his race.  (Jones Dep. at 143-45.)  Jones also testified that he engaged in protected activity on October 5, 2010, when he spoke with Director of Human Resources Giordano about discrimination in training and about acts of racial discrimination he had witnessed being taken against other African American employees of Gemalto.  (Id. at 155-57.) Jones further testified that, after these conversations, Vega started to scrutinize him more closely and to blame him for things that he had not done, culminating in his dismissal.  (Id. at 165.)  He also believes that Gemalto retaliated against him by firing him without first listening to his account of his altercation with Vega.  (Id. at 166-67.)

Jones maintains that the temporal proximity of his complaints about discrimination to Vega's harassment of him and to his firing are sufficient to demonstrate the causal connection between his protected activity and his firing.   "Causation can be shown through temporal proximity between the protected activity and the adverse employment action; an intervening pattern of antagonism; or the evidence taken as a whole."  Bartos v. MHM Corr. Servs., Inc., 454 F. App'x 74, 78 (3d Cir. 2011) (citations omitted).  "Where the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' it is sufficient standing alone

21

to create an inference of causality and defeat summary judgment." <u>LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n</u>, 503 F.3d 217, 232 (3d Cir. 2007) (citing <u>Clark Cnty. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273-74 (2001), and <u>Jalil v. Avdel Corp.</u>, 873 F.2d 701, 708 (3d Cir. 1989)). "Where the temporal proximity is not 'unusually suggestive,' we ask whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference.'" <u>Id.</u> (quoting <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 280 (3d Cir. 2000)). "Among the kinds of evidence that a plaintiff can proffer are intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." <u>Id.</u> at 232-33 (citing <u>Farrell</u>, 206 F.3d at 279-81, and <u>Anderson</u>, 477 U.S. at 252).

There is evidence in the record that Jones was fired approximately seven months after making his complaints about discrimination to Wright and Giordano. (<u>See</u> Jones Dep. at 163-67; Patel Decl. ¶¶ 27-28, Gemalto Ex. 7.) The Third Circuit has stated that, while "there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment." <u>LeBoon</u>, 503 F.3d at 233 (citing <u>Clark Cnty. Sch. Dist.</u>, 532 U.S. at 273, and <u>Andreoli v. Gates</u>, 482 F.3d 641, 650 (3d Cir. 2007)). Since Jones was fired more than three months after he complained about discrimination, the temporal proximity is not unduly suggestive of discrimination and, therefore, we must also consider whether the evidence that Jones experienced increased scrutiny and criticism after complaining about racial discrimination supports an inference of causation.

Jones testified at his deposition that, after he complained about discrimination, he was instructed to grind cards during his shift on one or two occasions. (Jones Dep. at 164-65.) Jones

22

had never been instructed to grind cards in connection to his job as a Feeder before he complained about racial discrimination to Wright and Giordano.  (Id.)  Jones also testified that, after he made his complaints to Wright and Giordano, he was subjected to increased scrutiny by Vega and that Vega blamed him for things he had not done.  (Id. at 165.)  We view the evidence of Vega's antagonism towards Jones after Jones complained of racial discrimination to Wright and Giordano "in the light most favorable to the non-moving party."  Funk v. GIGNA Grp. Ins., 648 F.3d 182, 190 (3d Cir. 2011).  We find that this evidence of Vega's antagonism or retaliatory animus, when viewed together with the temporal proximity between Jones's complaints of racial discrimination and his firing, support Jones's contention that there is a causal relationship between his protected activity and his termination.  We conclude that Jones has established a prima facie case of retaliation in violation of Title VII.

### 2.   Gemalto's reason for firing Jones

Gemalto argues that it is entitled to summary judgment as to Count II because it had legitimate, nondiscriminatory and non-retaliatory reasons for firing Jones.  Gemalto claims that it fired Jones for violently assaulting Vega and walking off his job without notifying anyone in authority.  Gemalto maintains that Jones's actions violate Gemalto's policies as they are set out in the Employee Handbook and the Montgomeryville Addendum to the Employee Handbook.

There is evidence in the record from Addlesberger, Prakash Patel, and Giordano, that, after Jones left Vega's office on April 28, 2011, Vega reported that he had been physically attacked by Jones and that he had not provoked Jones.  (Addlesberger Decl. ¶ 5; Patel Decl. ¶ 18; Giordano Decl. ¶ 11.)  Vega also told Addlesberger that Jones hit him numerous times, including several punches to the face.  (Addlesberger Decl. ¶ 5.)  Vega was seriously injured and had to be taken to the hospital for treatment.  (Id. ¶¶ 5-6.)  Farrell and Green's investigation of the

23

altercation concluded that "Jones pushed Mr. Vega's desk into him pinning him and then punched Mr. Vega numerous times mostly about the head and face.  The entire incident began about 10:58 a.m. and ended about 11:00 a.m. with John Jones leaving the plant, getting into his vehicle and driving south on Rout 309."  (Id.)  Jones left Gemalto without permission and without reporting the incident "to Human Resources, anyone in supervision, anyone in [Gemalto's] Security Department, or any other employee at Gemalto."  (Patel Decl. ¶ 18.)  In addition, Jones "did not inform anyone at Gemalto that he would be absent on Friday, April 29 or Monday, May 2, 2011."  (Id.)

Both Prakash Patel and Giordano determined that Jones's actions violated several of Gemalto's policies:  the Attendance Policy; the Code of Conduct regarding acts of violence against other employees; the Code of Conduct regarding leaving the job without authorization; the Workplace Violence Policy; and the Montgomeryville Attendance Policy, and that violation of any of these policies could result in termination.  (Id. ¶ 21; Giordano Decl. ¶¶ 17-18, Gemalto Ex. 1 at 7, 18, 19; Gemalto Ex. 2 at 5.)  Prakash Patel recommended to Giordano that Jones be terminated "for walking off the job without permission and workplace violence."  (Patel Decl. ¶ 27.)  The decision to terminate Jones was made by Giordano and Roy Patel, who decided to terminate Jones's employment "[f]or walking off the job and for workplace violence." (Giordano Dep. at 58-59, 61.)  We conclude, based on this evidence, that Gemalto has satisfied its burden of production of articulating a legitimate, nondiscriminatory reason for firing Jones. See Dellapena, 449 F. App'x at 213 (citing McDonnell Douglas, 411 U.S. at 802).

Jones argues that Gemalto's reasons for firing him are pretextual for four reasons:  (1) Gemalto's stated reasons for firing him are inconsistent;  (2) Jones acted in self-defense and was acquitted of assaulting Vega; (3) there is no evidence, other than Prakash Patel's and Giordano's

Declarations, that other employees have been fired for similar offenses; and (4) Jones did not violate any Gemalto policy regarding leaving the workplace without authorization.  Jones argues that a jury could find that Gemalto's stated reasons for firing him are pretextual because they are inconsistent with the reason for his firing contained in an April 29, 2011 memorandum authored by Prakash Patel.  Prakash Patel's memorandum states that Jones had been fired for "walking off the job without notifying PTC or Manager." (Jones Ex. 1)  Jones argues that this is inconsistent with Gemalto's present contention that he was fired for workplace violence as well as for walking off the job without authorization, and that a jury could find that Gemalto's reason for firing him is pretextual based on that inconsistency.  Prakash Patel, however, was not one of the individuals at Gemalto who made the decision to fire Jones.  The record evidence establishes that Giordano and Roy Patel jointly decided to fire Jones for both workplace violence and walking off the job.  (Giordano Dep. at 58-61.)  We find that there is no evidence that Gemalto gave inconsistent reasons for firing Jones.

Jones also argues that Gemalto's stated reasons for firing him are pretextual because he hit Vega in self-defense, after Vega initiated the altercation by shoving and punching him. (Jones Dep. at 198-201.)  Jones relies on evidence that a jury acquitted him of assaulting Vega on January 18, 2012.  (Jones Ex. 2.)  However, the jury reached its verdict more than eight months after Jones was fired, and Giordano and Roy Patel did not know, at the time they made the decision to fire Jones, that he would be acquitted.  In order to establish that Gemalto's reasons for firing him are pretextual, Jones cannot "'simply show that [Gemalto's] decision was wrong or mistaken, since the factual dispute is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent.'"  Cange v. Phila. Parking Auth., Civ. A. No. 08-3480, 2009 WL 3540784, at *12 (E.D. Pa. Oct. 30, 2009) (quoting

Fuentes, 32 F.3d at 765).   "'An employer's good faith *belief* that an employee engaged in misconduct is a legitimate reason for terminating [him], and the fact that the employer is actually wrong is insufficient to show that the alleged misconduct is a pretext for discrimination.'" Holocheck v. Luzerne Cnty. Head Start, Inc., No. 3:CV-04-2082, 2007 WL 954308, at *7 (M.D. Pa. Mar. 28, 2007) (quoting Droutman v. New York Blood Ctr., No. 03-CV-5384, 2005 WL 1796120, at *2 (E.D.N.Y. July 27, 2005), and citing Andy v. United Parcel Serv., Civ. A. No. 02-8231, 2003 WL 22697194, at *6 (E.D. Pa. Oct. 24, 2003)).   We conclude that the fact that Jones was eventually acquitted of assaulting Vega is not evidence that would establish that Gemalto's reason for firing Jones was pretextual.

Jones also argues that a jury could find that Gemalto's reason for firing him was pretextual because there is no evidence, other than the "unsubstantiated" Declarations of Prakash Patel and Giordano, that other Gemalto employees have also been fired for violating Gemalto's Attendance and Workplace Violence policies.   (Pl.'s Resp. at 4.)   Prakash Patel and Giordano both state in their Declarations that in 2009, Perry O. Yates and Travis Hoffman were fired for leaving their work locations without notifying a superior and failing to return to work in violation of Gemalto's Attendance policies.   (Patel Decl. ¶¶ 23-24; Giordano Decl. ¶¶ 19-20.) They both also state that, in 2011, Robert Weyant was terminated for a physical altercation in violation of Gemalto's Workplace Violence policy.   (Patel Decl. ¶ 25; Giordano Decl. ¶ 21.)   In addition, Prakash Patel states that in 2005, Rick Hercolini was terminated for a physical altercation in violation of Gemalto's Workplace Violence policy.   (Patel Decl. ¶ 26.)

Both Patel and Giordano state in their Declarations that the statements made in their Declarations are true and correct, under the penalty of perjury (28 U.S.C. § 1746).   (See Patel Decl. ¶ 42; Giordano Decl. ¶ 27.)   Declarations may be considered in support of a motion for

summary judgment.  See Fed. R. Civ. P. 56(c)(1)(A).  Declarations "used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated."  Fed. R Civ. P. 56(c)(1)(4).  Prakash Patel has worked in Gemalto's Human Resources Department since 2000 and has been a Senior Human Resource Generalist since 2011.  (Patel Decl. ¶ 2.)  Patel's job responsibilities in Human Resources for Gemalto include firing employees and he has stated that he has personal knowledge of the facts stated in his Declaration and that those facts are true and correct.  (Id. ¶ 3.)  Giordano has been the Human Resources Manager for Gemalto's Montgomeryville Facility since 2008 and her job duties include firing employees.  (Giordano Decl. ¶ 2.)  She has also stated that she has personal knowledge of the facts stated in her Declaration and that those facts are true and correct.  (Id.)  We conclude that Patel and Giordano are competent to testify on the matters at issue, that their Declarations are based on personal knowledge, and that they have set out facts that would be admissible in evidence.  We further conclude, accordingly, that their Declarations may be considered in connection with this Motion for Summary Judgment.

Jones also argues that a jury could find that Gemalto's stated reasons for firing him were pretextual because he did not actually violate any of Gemalto's policies by leaving work without authorization.  Gemalto's Code of Conduct states that "[d]epending upon the severity of the misconduct, employees may be subject to discipline, up to and including termination, for any of the following:  . . . "[c]ommitting any act of violence . . . against another employee in the workplace; . . . Sleeping on the job or leaving the job without authorization . . . ."  (Gemalto Ex. 1 at 18-19.)  There is evidence in the record that Jones both committed an act of violence against another employee in the workplace and left his job without authorization.

27

Jones also argues that a jury could find that he did not violate Gemalto's Attendance Policy because his attorney attempted to contact Gemalto on his behalf.  Gemalto's Employee Handbook states that "[i]t is important that employees notify their Manager, Department Head, or Human Resources as soon as they know they will be absent from work."  (Id. at 7.)  The Montgomeryville Addendum states that an employee is "required to personally contact the on-duty supervisor . . . to report all absences." (Gemalto Ex. 2 at 5.)  The evidence show that Jones never personally attempted to contact his duty supervisor to report his absences on April 29 and May 2, 2011 and that Jones's attorney did not attempt to contact Gemalto until May 2, 2011. (Jones Dep. at 251-52.)  We conclude that there is evidence on the record that Jones violated Gemalto's Attendance and Workplace Violence policies, and that he had been informed, through the Employee Handbook and Montgomeryville Addendum to the Employee Handbook, that violation of those policies could lead to his termination.

We conclude that Jones has pointed to no evidence in the record that would support his argument that Gemalto's stated reasons for firing him were pretextual.  Jones has thus failed to respond to the Motion for Summary Judgment as to Count II with a factual showing sufficient to establish that Gemalto's legitimate, nondiscriminatory reasons for his termination were pretextual.  We conclude that Gemalto is entitled to judgment as a matter of law as to Count II of the Complaint.  The Motion for Summary Judgment is, accordingly, granted as to Count II.

## IV.    CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment is granted.  An appropriate order follows.

BY THE COURT:

/s/John R. Padova_____
John R. Padova, J.

28